IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |
|---|---|
| OLIVIA RAMSEY<br>and WILLIAM STRATMANN,<br>    Plaintiffs,<br><br>            v.<br><br>AYVAZ PIZZA, LLC and<br>SHOUKAT DHANANI,<br>    Defendants. | Civil Action No.<br>1:23-cv-04801-SDG |

**OPINION AND ORDER**

This matter is before the court on the motion by Defendants Ayvaz Pizza, LLC and Shoukat Dhanani to compel arbitration and either (1) dismiss Plaintiff Olivia Ramsey's and William Stratmann's claims or (2) stay these proceedings pending the outcome of arbitration [ECF 16]. Also before the Court is Plaintiffs' motion to certify the class [ECF 9]. After careful consideration, the Court **GRANTS** Defendants' motion to compel arbitration, stays this case, and **DENIES** Plaintiffs' motion to certify the class. It also **DENIES** Plaintiffs' motion for leave to file a sur-reply [ECF 38].

**I.    BACKGROUND**

Plaintiffs are former pizza delivery drivers for Defendants who claim that Ayvaz paid them below minimum wage in violation of federal law.[1] They filed

---

1    ECF 1.

1

this Fair Labor Standards Act (FLSA) putative class action on October 10, 2023, seeking monetary, declaratory, and equitable relief.[2] Shortly after filing the case, Plaintiffs filed a motion for conditional certification of their FLSA collective action.[3] Instead of responding to that motion, Defendants filed the instant motion to compel arbitration.[4] Defendants claim that this action is inappropriate because the two named Plaintiffs each signed valid, enforceable arbitration agreements that require them to pursue these claims on an individual basis in arbitration.[5] Plaintiffs argue that the arbitration agreements are unenforceable for various reasons.

## II.  LEGAL STANDARD

The Federal Arbitration Act reflects the strong federal policy in favor of arbitration. *Howsam v Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (noting that the Supreme Court has "long recognized and enforced a 'liberal federal policy favoring arbitration agreements'") (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)). *See also Parnell v. CashCall, Inc.*, 804 F.3d

---

[2]  *Id.* at ¶ 1.

[3]  ECF 9.

[4]  ECF 16.

[5]  Defendants argue that the claims against Dhanani are within the scope of the arbitration provision as well. Neither Plaintiff disputes that the arbitration provision, if applicable, applies to the claims against both parties.

1142, 1146 (11th Cir. 2015) ("The FAA places arbitration agreements on equal footing with all other contracts and sets forth a clear presumption—'a national policy'—in favor of arbitration.") (citations omitted). As a general matter, the FAA governs and renders enforceable arbitration agreements that are part of an employment contract. *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001); *Rodriguez v. Castforce, Inc.*, 190 F. Supp. 3d 1148, 1149 (N.D. Ga. 2016) (compelling arbitration in an FLSA case).

However, absent a valid arbitration agreement, "a court cannot compel the parties to settle their dispute in an arbitral forum." *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016) (quoting *Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004)). Thus, before compelling arbitration, a court must first answer the "threshold question of whether an arbitration agreement exists at all," and this question is "simply a matter of contract." *Id.* (internal quotation marks and citation omitted).

Under the FAA, "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. A district court should apply a "summary judgement-like" standard of review, and "conclude as a matter of law that parties did or did not enter into an arbitration agreement *only if* 'there is no genuine dispute as to any material fact' concerning the formation of such an

agreement." *Bazemore*, 827 F.3d at 1333. Finally, in determining whether an arbitration agreement exists a court "should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1368 (11th Cir. 2005) ("[S]tate law generally governs whether an enforceable contract or agreement to arbitrate exists.").

### III. DISCUSSION

Defendants argue that this case must be arbitrated pursuant to valid, enforceable arbitration agreements signed by Plaintiffs. To that end, Defendants have submitted copies of the arbitration agreements containing Plaintiffs' electronic signatures manifesting their assent to the agreements.[6]

Neither Ramsey nor Stratmann deny that if the arbitration agreements are enforceable, this action must proceed in arbitration. However, both Plaintiffs deny the validity and enforceability of the agreements, each for different reasons. The Court finds that the arbitration agreements signed by both Ramsey and Stratmann are valid and enforceable and thus, compels the parties to arbitrate their claims individually.

---

[6]   ECF 16-4; ECF 16-5; ECF 16-6.

**A.     No genuine issue of material fact exists regarding the formation of a valid arbitration agreement between Ramsey and Ayvaz.**

After reviewing the record, the Court concludes that Ramsey signed valid and enforceable arbitration agreements with Ayvaz.

**1.     Facts surrounding Ramsey's completion of the 2022 and 2023 arbitration agreements.**

Ramsey worked as a delivery driver and in-store shift lead for Ayvaz from early 2021 to November 2022 and again from May 2023 to August 2023.[7] During her time with Ayvaz, she allegedly signed two separate arbitration agreements relevant to this suit: one in January 2022 and another when she was re-hired in May 2023.

Defendants submitted the affidavit of William Henefey, the Human Resources Lead Generalist for Ayvaz.[8] Henefey testified to the procedures Ayvaz used in 2022 and 2023 with respect to onboarding and document-signing by employees. In early 2022, "Ayvaz used a password-protected online environment," UltiPro, to grant employees access to documents for signing.[9] Employees would create a unique password and use a security question and answer system to protect their account.[10] Ayvez did not have access to employees'

---

[7]   ECF 27-2, ¶¶ 1–4.

[8]   ECF 16-2, ¶ 1.

[9]   *Id.* ¶¶ 4–5.

[10]  *Id.* ¶¶ 5–6.

5

passwords.[11] An employee needed to be logged in to his or her secure account in order to sign documents.

Ayvaz changed its process in August 2022.[12] Starting then, upon extending an offer for employment, Ayvez sent an email to the employee's personal email address requesting that they complete their on-boarding paperwork.[13] The email contained a link to a secure website where the documents could be completed.[14] To gain access to the documents, employees needed to created individualized passwords.[15] Once logged in to the secure website, employees could review and sign on-boarding documents. This procedure was followed during Ramsey's 2023 onboarding meeting.[16]

Defendants provided an arbitration agreement electronically signed by Ramsey in January 2022,[17] but Ramsey does not remember signing it.[18] When Ramsey returned in 2023, she underwent an onboarding process utilizing the method implemented beginning in August 2022, as discussed above. After her

---

[11]   *Id.* ¶ 7.

[12]   *Id.* ¶ 14.

[13]   *Id.* ¶ 17.

[14]   *Id.* ¶ 18.

[15]   *Id.* ¶ 19.

[16]   *Id.* ¶15.

[17]   ECF 16-4, at 1-3.

[18]   ECF 27-2, ¶ 20.

manager completed his own paperwork on an electronic tablet, he handed Ramsey the tablet, on which she remembers filling out her I-9 form.[19] She remembers this taking about ten minutes.[20] Under the process attested to by Henefey, Ramsey could not have filled out the I-9 without having been logged into her personal account, using her password. After completing the I-9, she handed the tablet back to her manager.[21]

### 2.    Analysis

Ramsey calls into question the validity of the two separate agreements she signed by attacking the authenticity of her electronic signatures on them.[22] She does not affirmatively deny signing the arbitration agreements, but rather claims she does not remember signing them and that her manager might have signed them on her behalf.[23] Defendants retort that this speculative and conclusory argument is insufficient to raise a genuine dispute of fact in light of the evidence.

Georgia law governs the formation and validity of the Ramsey contract.[24] Under Georgia law, "[t]o constitute a valid contract, there must be parties able to

---

[19]    *Id.* ¶ 21.

[20]    *Id.* ¶ 19.

[21]    *Id.* ¶ 22.

[22]    ECF 27, at 14.

[23]    ECF 27-2 ¶ 13.

[24]    The parties agree that Georgia law governs whether Ramsey entered into a contract to arbitrate. "Georgia follows the traditional rule of *lex loci contractus*."

7

contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." O.C.G.A. § 13-3-1. The formation of a contract with an electronic signature is at issue here.

Two cases, albeit unreported, are particularly helpful here. First, *Reed v. Eastside Medical Center, LLC,* No. 1:19-cv-03967-SDG, 2020 WL 5659436 (N.D. Ga. Sep. 23, 2020). In *Reed*, the defendants sought to compel arbitration relying on an electronically signed arbitration agreement. The plaintiff contested the authenticity of her signature and presented some evidence calling it into question. First, that she had not initialed the lines on the arbitration agreement itself and second, that she *had* signed other paperwork at the same time the arbitration agreement was allegedly signed, but the other documents were signed by hand. Defendants in that case presented no evidence whatsoever demonstrating that the plaintiff was the one who signed the agreement. This Court thus denied the motion without prejudice and ordered limited discovery on the alleged formation of the

---

*McGill v. Am. Trucking & Trans., Ins. Co.*, 77 F. Supp. 3d 1261, 1264 (N.D. Ga. 2015). Pursuant to this doctrine, "contracts are governed by the law of the place where they were 'made.'" *Id*. Contracts are "made" where "the last act essential to the completion of the contract was done." *Gen. Tel. Co. of Se. v. Trimm*, 252 Ga. 95, 95 (1984) (citing *Peretzman v. Borochoff*, 58 Ga. App. 838 (1938)). Here, the last act necessary to "make" the Arbitration Agreement was Ramsey's execution of it in Georgia. ECF 16-1, at 3–10.

agreement. After discovery, the defendants again moved to compel arbitration. This Court granted the motion because the defendants brought forth evidence regarding the standard procedures for signing forms used at the time the plaintiff's signature was procured as well as an affidavit from the employee who conducted the form-signature procedure with the plaintiff. *Id.* at *2. The plaintiff did not dispute the facts, but simply noted that she did not remember signing the agreement. *Id*. at *5. In light of the affirmative evidence regarding the procurement of her signature, this was not enough to refute the authenticity of the signature and the Court compelled arbitration.

*Walker v. VXI Global Solutions LLC*, No. 1:19-CV-4846-MLB, 2021 WL 2525721, at *3 (N.D. Ga. June 21, 2021), presents an even more similar factual scenario. There, as part of her new hire orientation, the plaintiff electronically signed various documents, including an arbitration agreement. The plaintiff argued that she never signed any arbitration agreement during her employment and that the defendant had not presented enough evidence showing that she *had* signed an agreement. The court disagreed, finding that the defendant's submission of the arbitration agreement, bearing the basic requirements of offer, acceptance, and consideration, and showing a signature matching the plaintiff's name, as well as affidavits attesting to its standard business practice of having employees sign an agreement to arbitrate during the orientation process at the

9

beginning of their employment, were sufficient to meet its burden. *Id*. at *4. Further, the court concluded that "only [the p]laintiff's affidavit sp[oke] directly on the issue of whether she signed any agreement to arbitrate." *Id*. at *5. That affidavit contained only conclusory statements, which were not enough to raise a dispute of fact in light of the defendant's evidence.

The Court finds that Defendants have met their burden of demonstrating the existence of valid arbitration agreements with Ramsey by producing both the electronically signed agreements and testimony regarding its standard onboarding and security procedures for obtaining signatures. First, they have produced the signed documents themselves. Second, and more importantly, they have provided testimony explaining the secure procedures used to obtain electronic signatures and clarified that these procedures were in place and consistent with Ramsey's review of and assent to the arbitration agreements. Henefey's testimony on this point is critical. As discussed above, in both 2022 and 2023, Ramsey was required to create a personal account, including a password, and obtain access to her email through a secure portal to sign her documents. Defendants did not have access to their employees' passwords. The evidence demonstrates that Ramsey's signature could only appear on the documents if she was logged into the system and entered her signature on the arbitration agreements herself.

Ramsey offers only vague, speculative evidence to rebut the validity of the signed agreements and has thus not sufficiently called into question the authenticity of her electronic signature. As to the January 2022 signature, she simply states that she does not remember signing it. In light of the evidence from Defendants with respect to how an electronic signature appears on their documents, Ramsey's lapse in memory fails to raise a material dispute of fact. *See Reed*, 2021 WL 1967407 at *5 ("[Plaintiff] does not recall signing the Arbitration Agreement—completely understandable given the circumstances. But lack of memory is not enough to create a genuine issue of material fact under Georgia law.").

Ramsey points generally to a culture of password sharing at Ayvez, but there is no evidence, nor does Ramsey even allege, that at the time the January 2022 arbitration agreement was signed, she had shared her password with anyone at Ayvez. She provides two text message exchanges showing password sharing between herself and her manager, but these are from late May and June of 2023[25]— *after* both agreements were signed. There is no evidence that anyone had access to Ramsey's private credentials and that they used those credentials to log in and sign the January 2022 arbitration agreement.

---

[25]   ECF 57.

Ramsey also fails to raise a dispute with respect to her May 2023 signature. First, similar to the January 2022 agreement, Ramsey never affirmatively claims that she shared her credentials with anyone. Rather, Ramsey speculates that during her onboarding process, "it is *possible* that [her] manager signed the arbitration agreement for [her] *after taking the tablet back*."[26] But the arbitration agreement was signed *before* she signed her I-9 form, which she admits doing.[27] While her manager had the tablet prior to Ramsey signing her agreements, she believes he was filling out his own related paperwork.[28] And, Ramsey does not testify that she was even logged in to her account prior to being handed the tablet, making it impossible for her manager to have signed the arbitration agreement on her behalf before giving her the tablet. At bottom, even assuming everything Ramsey states is true, there is a lack of non-speculative evidence suggesting that anyone other than Ramsey herself signed the arbitration agreements.

Ramsey relies heavily on two California district court cases to support her position. First, she relies on *Zamudio v. Aerotek, Inc.*, 698 F. Supp. 3d 1202, 1204 (E.D. Cal. 2023) from the Eastern District of California (applying California law) for both

---

[26] *Id.* ¶ 23 (emphasis added).

[27] *Compare* ECF 16-5, at 5, *with* ECF 16-7, at 2 (showing the arbitration agreement signed at 6:32:44 PM on May 8, 2024 and the I-9 form signed at 18:43:22 (6:43:22 PM) on the same day).

[28] ECF 27-2, ¶ 21.

statements of the law and factual comparisons. The Court rejects Ramsey's *Zamudio*-based assertions of law to the extent they differ from Georgia law. Her factual comparisons to *Zamudio* are also ineffective given the factually similar cases in this district, which are far more persuasive on this Court. The second case, *Medina v. Circle K Stores, Inc.*, No. EDCV 22-557 JGB, 2022 U.S. Dist. LEXIS 138211, at *7 (C.D. Cal. May 5, 2022) from the Central District of California is also unpersuasive. Ramsey relies on a footnote in this case where the court noted that taking only six minutes to complete onboarding paperwork suggests that an employee may not have been presented with all the necessary paperwork. The court drew this conclusion in part because the arbitration agreement itself was five pages single-spaced. Ramsey speculates that it took her "maybe ten minutes" to complete her paperwork,[29] and that difference matters where the arbitration agreement at issue here is only approximately two pages. Ramsey's proffered case law is unpersuasive. Accordingly, the Court determines that Defendants have met their burden of demonstrating that a valid, enforceable arbitration agreement exists as to Ramsey.

---

[29] ECF 27-2, ¶ 19.

### B. Stratmann has not offered evidence that he was under economic duress related exclusively to the arbitration agreement.

Stratmann, by contrast, does not contest his receipt and signing of the arbitration agreement, but rather asserts the affirmative defense that his signature was obtained through unlawful coercion—specifically, that he was under economic duress.[30]

#### 1. Facts related to Stratmann's signature of the arbitration agreement.

Stratmann worked for Ayvaz as a delivery driver from early 2021 to October 2023. He claims that on November 17, 2022, his manager, Jennifer Davis, told the store employees that they needed to complete "paperwork" in order for their paychecks to issue the following day.[31] Stratmann understood this to mean that unless he signed the paperwork, he would not be paid the following day for the work he had already completed.[32] Davis denies issuing any such ultimatum.[33] Because Stratmann's finances were tight—he was living paycheck-to-paycheck— he claims he felt pressure to sign the paperwork, and so he did.[34] He does not

---

[30] ECF 27, at 8–9.

[31] ECF 27-1, ¶ 8.

[32] *Id.* ¶ 10.

[33] *Id.* ¶ 6.

[34] *Id.*, ¶¶ 11–12. Defendants argue that Stratmann's evidence of alleged economic duress is hearsay. Not so: it could easily be "'reduced to admissible evidence at trial or reduced to an admissible form,' say, by 'hav[ing] the hearsay declarant testify directly to the matter at trial.'" *Meunier Carlin & Curfman, LLC*

dispute that the paperwork included the arbitration agreement and that he did in fact sign it that day.

### 2. Analysis

Stratmann argues that the arbitration agreement is unenforceable for two reasons. First, because his signature was obtained through unlawful economic duress. Second, and separately, he argues that this Court has the discretion to invalidate the arbitration clause because Stratmann's signature was procured while he was a potential putative member of an FLSA collection action in Minnesota. He argues that *Billingsley v. Citi Trends, Inc.*, 560 F. App'x 914, 919 (11th Cir. 2014), grants the Court discretion to invalidate the agreement on these grounds as well.

As a preliminary matter, the Court agrees with the parties that Texas law governs Stratmann's claims since his contract was formed in Texas.[35] *In re RLS*

---

*v. Scidera, Inc.*, 324 F. Supp. 3d 1269, 1278 (N.D. Ga. 2018) (quoting *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293 (11th Cir. 2012)), *reconsideration denied*, No.1:15-CV-1665-RWS, 2018 WL 10396435 (N.D. Ga. Dec. 26, 2018), *aff'd*, No. 19-11852, 2020 WL 2188667 (11th Cir. May 6, 2020). Defendants have not argued that the statement Stratmann relied on is incapable of being presented in an admissible form; therefore, the Court rejects its argument. *See Rindfleisch v. Gentiva Health Servs., Inc.*, No. 1:10-CV-3288-SCJ, 2015 WL 12551173, at *6 (N.D. Ga. Oct. 28, 2015) ("Plaintiffs make no argument that this information cannot be reduced to admissible evidence at trial and the Court will consider it.").

[35] As noted in footnote 24, in Georgia, "contracts are governed by the law of the place where they were 'made.'" *McGill*, 77 F. Supp. at 1264. In Stratmann's case,

*Legal Solutions, LLC*, 221 S.W.3d 629, 630 (Tex. 2007), is fatal to Stratmann's first argument. Under very similar facts to the instant case, the Texas Supreme Court held that duress does not preclude enforcement of an agreement's arbitration provision unless the duress was related *exclusively* to the arbitration provision. There, the employee was presented with an "agreement" that contained numerous provisions related to term, compensation, non-competition, arbitration, and other subjects. The employer told the employee that she would not be paid if she refused to sign the agreement. The employee eventually signed, but told her employer that she was signing under duress, specifically stating that her superiors "forced [her] to sign even though [she] vehemently objected to the arbitration clause." *In re RLS Legal Sols., LLC*, 221 S.W.3d at 631.

    The court nonetheless compelled arbitration because she failed to establish that she objected to *only* the arbitration clause. Therefore, while the court agreed that the employee signed the agreement under economic duress, because the duress did not relate solely to the arbitration provision, that provision had to be enforced and the claim of economic duress had to be decided in arbitration. *Id.* at 632.

---

    the last act necessary to "make" the Arbitration Agreement was his signature of it in Texas.

The instant case is on all fours with *RLS Legal Solutions*. Stratmann testified that his manager told him he needed to complete "some paperwork" for his paycheck to issue on payday.[36] He consistently connects his alleged duress to the need to sign "paperwork." The paperwork, according to his manager, included an I-9 form, a W-4, and documents relating to direct deposit, state tax information, Ayvaz's policies, as well as an arbitration agreement.[37] Stratmann does not claim any duress or objection relating specifically or exclusively to the arbitration agreement. Under Texas law, this is insufficient to invalidate the arbitration provision. Accordingly, Stratmann must raise his defense of economic duress in arbitration.

Stratmann's second argument fails as well. He contends that because he was a potential putative member of an FLSA action against Ayvaz in a Minnesota action, a fact of which he was not aware at the time, Ayvez rushed him to sign an arbitration agreement.

Stratmann relies on *Billingsley* to support this argument. There, the defendant moved to compel arbitration based on the terms of an arbitration agreement executed after the filing of the case but before the district court certified the FLSA collective action. The district court held that the arbitration agreements

---

[36]   ECF 27-1, ¶ 8.

[37]   ECF 35-1, ¶ 12.

procured during the pendency of the motion for conditional certification were unconscionable. The Eleventh Circuit affirmed, stating that "[b]ecause formal notice to putative FLSA collective members is provided *after* conditional certification has been approved by the district court, pre-certification, *ex parte* communication with putative FLSA collective members about the case has an inherent risk of prejudice and opportunities for impropriety." 560 F. App'x at 921. Additionally, it concluded that the "'purpose and effect' of the arbitration agreement was 'to protect [the defendant] in *this* lawsuit.'" *Id*. at 919. The timing of the arbitration agreement's rollout was also problematic because it "was calculated to reduce or eliminate the number of collective action opt-in Plaintiffs in *this* case" and the rollout was "replete with deceit" and "designed to be[ ] intimidating and coercive." *Id*.

Notwithstanding *Billingsley*, this Court will not invalidate the agreement here for a few reasons. First, unlike the *Billingsley* plaintiffs, Stratmann signed the arbitration agreement at issue long before this case was filed. While *Billingsley* might provide support to the court in the Minnesota action to invalidate the arbitration agreements, it is inapplicable here. Further, there are simply no facts to allow the Court to conclude that Ayvaz's attempt to get Stratmann to sign his agreement was based on any deceit or effort to intimidate or coerce him.

Accordingly, the Court finds that Stratmann's arbitration agreement is enforceable.

## IV. Conclusion

Defendants' motion to arbitrate [ECF 16] is **GRANTED**. Plaintiffs' motion to conditionally certify the class [ECF 9] is thus **DENIED** as moot. Plaintiffs' motion for leave to file a sur-reply [ECF 38] is also **DENIED**.

The parties are **ORDERED** to arbitrate in accordance with their individual agreements. The parties are further **ORDERED** to file with this Court every 180 days a joint status report concerning the status of Plaintiffs' respective arbitration proceedings. The parties must notify the Court, within 7 days, if their dispute resolves through arbitration, settlement, or otherwise.

The Clerk of Court is **DIRECTED** to **ADMINISTRATIVELY CLOSE** this case. This closure is not a dismissal and does not preclude the filing of documents. The case may be re-opened if necessary. If the parties fail to file a joint status report at least every 180 days as instructed, however, the case will be dismissed with prejudice at that time.

**SO ORDERED** this 30th day of September, 2024.

Steven D. Grimberg
United States District Judge